THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GENE R. BILSKI, Defendant-Appellant.

Second District   No. 2—01—0769

Opinion filed September 20, 2002.

Kathleen T. Zellner and Douglas H. Johnson, both of Kathleen T. Zellner & Associates, of Naperville, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Gerald E. Nora, of Vernon Hills, for the People.

JUSTICE GROMETER delivered the opinion of the court:

Defendant, Gene R. Bilski, pleaded guilty to a charge of first-degree murder (720 ILCS 5/9—1 (West 1998)). Following a sentencing hearing, the trial court imposed a sentence of 63 years' imprisonment. Defendant now appeals this sentence. For the reasons that follow, we affirm.

■ Before turning to the merits of this appeal, we wish to address the importance we attach to parties' compliance with the supreme court rules that govern the form and content of appellate briefs. Upon

reviewing defendant's opening brief, we noted that defendant failed to comply with a number of these rules. Most problematic was defendant's persistent failure to provide pinpoint citations to the cases upon which he relies. Rule 341(d) states that "[c]itations shall be made as provided in Rule 6." Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(d), eff. October 1, 2001. Rule 6 requires that "[c]itations of cases must be by title, to the page of the volume where the case begins, *and to the pages upon which the pertinent matter appears* in at least one of the reporters cited." (Emphasis added.) 145 Ill. 2d R. 6. The failure to comply with these rules justifies finding an argument waived. See *Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 927-28 (1992). As the application of these rules would have resulted in defendant's waiving all of his arguments, we issued a rule to show cause why this appeal should not be dismissed. Defendant subsequently filed an amended brief that complied with the applicable rules. Hence, we will proceed to the merits of defendant's arguments.

## I. BACKGROUND

■ Defendant entered an *Alford* plea (see *North Carolina v. Alford*, 400 U.S. 25, 37, 27 L. Ed. 2d 162, 171, 91 S. Ct. 160, 167 (1970) (holding a defendant is entitled to enter a guilty plea while maintaining his or her innocence)) to a charge of first-degree murder (720 ILCS 5/9—1 (West 1998)) arising out of the death of 57-day-old Trinity Bilski. Defendant was not Trinity's biological father. Pursuant to a plea agreement, he was to receive a sentence of between 20 and 75 years' imprisonment. A sentencing hearing was held on March 13, 2001.

At the hearing, Jeffrey Norris, a police officer, was the first to testify. Norris stated that paramedics were called to the residence of defendant and Cheryl Issacson, Trinity's mother, on the evening of December 30, 1999. Upon their arrival, they found defendant and Issacson in the front yard; defendant was holding Trinity. Trinity was transported to the Northern Illinois Medical Center, where she was pronounced dead upon arrival. Norris proceeded to the hospital and was informed by the paramedics that the emergency-room doctor was suspicious as to the cause of Trinity's death. The doctor observed specks of blood in Trinity's eyes, which is common in child-abuse cases.

Norris and a deputy coroner interviewed defendant and Issacson. Issacson related that during the day Trinity appeared to have a cold, was fussy, and was not eating properly. She and defendant decided to go to the store to get some groceries and medication. Between 4:30 and 5 p.m., Trinity was refusing to eat. Her gums were clenched so that Issacson could not insert the nipple of her bottle. Upon their ar-

rival home, Issacson removed Trinity from the car and defendant unloaded the groceries. She placed Trinity on the floor in her car seat and started to put the groceries away. About 10 minutes later, she removed Trinity from the car seat and noticed that she was limp and blue. Defendant told Issacson to call 911, and he attempted to perform cardiopulmonary resuscitation (CPR) on Trinity. At this point, they went outside to await the ambulance. Issacson also related that she had been home all day and she had not observed any bruises upon Trinity prior to calling the ambulance.

Norris also interviewed defendant at the hospital. Defendant largely agreed with what Issacson had related to Norris. He did not indicate during this interview that he had any knowledge as to how Trinity had become injured. He also did not state whether he had been alone with the infant that day.

The next morning, Norris was present at the autopsy that was performed upon Trinity. The autopsy was performed by Dr. Lawrence Blum. Dr. Blum noted a small swelling on Trinity's forehead, which he said was unusual and a cause for concern, as well as two small bruises on the left side of her head. An internal examination revealed three fractured ribs; one fracture showed signs of healing. Dr. Blum also discovered three fractures on the infant's skull. Finally, the doctor observed hemorrhages in Trinity's body, head, and eyes. Dr. Blum believed that death was the result of severe trauma to the head from a blunt object.

Defendant and Issacson were interviewed a second time at the Fox Lake police department. She reiterated the version of events that she had given the night before. Issacson stated that she did not know how her child had become injured. She also stated that she never saw defendant do anything harmful to the baby. Issacson agreed to take a polygraph examination.

Defendant also reiterated the statement that he gave at the hospital. Norris then informed defendant of the results of the autopsy. Defendant replied that neither he nor Issacson would harm Trinity. At about this time, Norris received a phone call and was informed that a radiologist had discovered fractures in Trinity's right arm, right leg, and left hip. He informed defendant of these findings. Defendant then stated that he sometimes played roughly with Trinity. He said that he would pick her up by the arms and bounce her on her legs. Defendant stated that he believed this would strengthen her limbs. He related that he would sometimes drop Trinity from a height of a foot or two onto a bed. Defendant also stated that on one occasion he was bathing the infant in a marble sink. He left her momentarily to get something, and she may have hit her head.

Still later in the interview, defendant asked what would happen if Trinity had been dropped down a flight of stairs. Detective Schindler, who was also present during the interview, told defendant that it could cause serious injuries to a baby. Defendant then explained that he was carrying Trinity down a flight of stairs, lost his balance, and dropped her. According to defendant, Trinity was crying. He checked her for injuries but discovered none, so he assumed everything was fine. Defendant stated that this occurred before he and Issacson had gone shopping on December 30. He added that he did not tell Issacson because he was embarrassed and feared she would leave him.

Norris also interviewed defendant's grandfather. The grandfather related that defendant had been stationed in Saudi Arabia while serving in the Navy. Defendant would call home daily, crying and wanting to come home. On one occasion, he was found banging his head on a wall and had to be sedated. The grandfather also described problems between him and defendant. He stated that defendant angered easily and often threatened him. He obtained an order of protection against defendant following an incident where the grandfather required hospitalization.

Norris also acknowledged that there were no records of medical reports indicating abuse prior to Trinity's death. He stated that defendant had never bothered Issacson or tried to influence her testimony. Defendant remained in the area during the investigation. Norris further acknowledged that there were no indications that defendant abused alcohol or drugs. He further testified that, at the time of Trinity's death, Issacson was working full time.

The State next called Dr. Blum, who performed the autopsy on Trinity. Blum first testified that he found four bruises on Trinity's head. In his internal examination, Blum first located four fresh rib fractures on the front side of Trinity's rib cage. He also found two fractures on the rear side of her rib cage that showed signs of healing. He estimated that these fractures were between 7 and 14 days old. He found a bruise on the muscle overlying her left chest region. His internal examination of Trinity's skull revealed bruises on the skull's interior. Some corresponded to bruises on the outside of her skull; however, Blum also found additional bruises. He also observed three skull fractures. He noted that Trinity's brain was swollen, its normal curvature was flattened, and there was evidence of hemorrhaging.

Blum opined that the fractures were caused by impacts with a hard round or flattened object. He stated that such injuries were typical of fatal or near-fatal events, rather than simple falls or roughhousing. He characterized the blunt force necessary to produce such an injury as "severe." Ultimately, he opined that Trinity died of brain

swelling and hemorrhaging around the brain caused by an abusive head injury.

Blum also testified that Trinity's eyes were removed and sent to a specialist for analysis. Hemorrhages in the globe of the eyes and along the optical nerves were observed. Additionally, the specialist located signs of iron staining in her eye tissue. Iron staining occurs when red blood cells break down. Blum stated that it takes at least two to three days for the cells to break down. The specialist was of the opinion that the hemorrhaging in the eyes was of a nonaccidental etiology. Blum also received a report from a radiologist. The radiologist confirmed the skull fractures and found additional fractures to Trinity's arms and legs. A fracture to the infant's right arm showed signs of healing.

Further, Blum opined that the rib fractures would be very painful, since the ribs would move every time Trinity took a breath. He added that it was unlikely that the fresh rib fractures were caused by CPR and impossible that the healing ones were. Blum stated that Trinity's injuries were caused by more than one impact and that the totality of her injuries was not consistent with a fall down the stairs. Finally, he opined that the oldest injuries he observed occurred three or four weeks prior to Trinity's death.

Mark Pleasant, an investigator for the Lake County State's Attorney's office, testified next. Pleasant interviewed Robin Rowe, a woman who had dated defendant for about a month beginning in January 2000. On one occasion, the two were arguing and defendant told her to "shut up." When she refused, he showed her a handgun and stated, "[W]ill you shut up now?" Rowe stated that defendant had a bad temper but never struck her. He threatened to "mess up her face" and blow up her car if she left him. Rowe told Pleasant that Bilski stated that he had beaten up his ex-wife.

Pleasant also interviewed defendant's ex-wife, April Paszkiewicz. The couple separated in September 1999, but Paszkiewicz did not file for divorce until after Trinity's death. She stated that defendant had a bad temper and that little things would cause him to fly into a violent rage. Generally, when defendant was angry at her, he would grab her by the shoulders, shake her, and push her into objects. On one occasion, he struck her, giving her a "fat lip." Paszkiewicz related that defendant stabbed a person in 1995. He told the police it was self-defense; however, he admitted to Paszkiewicz that he had lied to the police and had stabbed the person because the person had spit on him.

Pleasant interviewed Issacson as well. Issacson told Pleasant that defendant believed she was unhappy with their relationship and that defendant stated that he could kill Trinity and himself so that Issacson could have a happy life. Pleasant also reviewed a portion of Issac-

son's diary, where she described an incident where defendant was grieving over the death of his dog. Defendant told Issacson that she would not know what it felt like until she held her own dead baby in her arms. Issacson also told Pleasant that defendant was Trinity's primary caretaker.

Pleasant next described his interview with defendant. Defendant first made reference to an incident where Trinity had fallen from a footstool. He then described an incident where Trinity had fallen through the bottom of her cradle and gotten her head wedged between the cradle and the floor. Defendant next described an incident where he had dropped the infant down the stairs. Defendant asked Pleasant whether he would be able to return home if he were charged with manslaughter. Pleasant replied that he did not believe so.

Later, defendant stated that the story about Trinity falling through the bottom of her cradle was untrue. According to defendant, the truth was that he was holding the cradle by the handles while spinning around. The bottom dropped out of the cradle and Trinity flew into a beam about six feet away. Defendant stated that Trinity was "out of it" for about 15 to 30 seconds.

During the interview, defendant acknowledged that he was responsible for Trinity's injuries. He denied ever being frustrated or angry with her. Defendant stated that he wanted to kill himself and that he was haunted by what he had done. He said that Trinity was his baby and that he loved her. Following the conclusion of Pleasant's testimony, Issacson made a victim-impact statement. The State then rested.

Defendant presented three witnesses on his behalf. The first was Marietta Jankovic. Jankovic was defendant's father's girlfriend of 17 years and has known defendant since he was four years old. She visited defendant shortly before Christmas 1999. Initially, defendant would not permit Jankovic to hold Trinity because Jankovic had just come in from the cold and smelled like cigarette smoke. She stated that Trinity appeared happy and did not seem to fear defendant. Trinity did not cry at all during Jankovic's visit.

Defendant next called Toni Liotta. Liotta began dating defendant in March 2000. Liotta testified that she never saw defendant act violently or display anger toward anyone but himself. On one evening, defendant was upset and stated that he did not want to live. Defendant stabbed himself in the arm several times with a pen. She called 911. The police came, but defendant had already left. He returned later. Liotta told him that she thought he should seek counseling, and defendant agreed. They obtained an appointment at a counseling center, but defendant was incarcerated before the appointment. Liotta also stated that she had never seen defendant abuse alcohol.

Defendant's final witness was his father, Eugene R. Bilski. Defendant's father testified that he and Deborah Baleskin were defendant's parents. He was never married to Baleskin, although they were together for seven years. Defendant's father and mother were abusing drugs at that point in their lives. The couple lived in an attic apartment in the home of defendant's paternal grandparents. Defendant's grandmother took care of defendant most of the time. The grandmother was running a bar at the time, and she kept defendant with her as she tended to the bar. Defendant's grandmother wanted to raise him. His grandfather, on the other hand, showed no affection toward defendant. Defendant's grandfather was an alcoholic and was diagnosed with bipolar disorder.

Defendant's father was selling drugs out of the house where defendant resided. When defendant was about five years old, his father was arrested on a drug-related charge. Baleskin sold everything in the house and left. Defendant did not see her again until he was 18 years old. Just before she left, Baleskin "sold" defendant to defendant's grandmother for $200. The grandmother also offered defendant's father $100 if he would consent to her adopting defendant. Defendant's father declined.

Until defendant was in his early teens, he believed his father was actually his brother. After defendant's father completed a drug-treatment program, he asked if he could return to the house. The grandmother allowed him to do so only if he promised not to tell defendant that he was his father. When defendant was about 12 years old, his father told him the truth. After this revelation, defendant appeared to no longer know whom to believe or trust.

Also, at about this time, the grandmother was diagnosed with breast cancer. She died three to four years later. During her illness, defendant cared for her, acting as a nurse. Additionally, defendant's father stated that defendant tried his best to be a father to Trinity and that defendant loved the baby.

Finally, defendant made a statement in allocution. In his statement he maintained that he loved Trinity and her death was accidental. He requested that the court either impose a sentence that would allow him to be returned to a useful role in society at some point or sentence him to death.

The trial court first denied defendant's request to impose the death penalty, noting that it was not possible in light of the plea agreement into which defendant had entered. The court next rejected the State's contention that defendant was eligible for an extended-term sentence because the murder was accompanied by excessively brutal or heinous behavior. However, the court did find that he was eligible

for an extended-term sentence because the offense was committed against a person under the age of 12.

The court then went on to determine what it believed to be an appropriate sentence. It first stated that it had considered the evidence presented at the hearing, the presentence investigation report, the financial impact of incarceration, the arguments of the parties, defendant's statement, and the victim-impact statement. The court found the defendant was Trinity's primary caretaker. It acknowledged that defendant's motive was unclear. The court also found defendant's claim of accident incredible. The court considered injuries suffered by Trinity occurring prior to the date of her death in arriving at a sentence.

The trial court stated that it had considered the mitigating evidence presented on defendant's behalf. It noted defendant's dysfunctional childhood. The court specifically referred to the fact that defendant's father was dealing drugs out of defendant's home and that defendant suffered from bipolar disorder. Regarding defendant's mental illness, however, the court observed that it could be considered both an aggravating and mitigating factor. The court noted defendant's history of threats and violence with girlfriends, his grandfather, and while in the Navy. The court concluded that it was likely that defendant would be violent in the future and therefore a lengthy sentence was required to protect society. Accordingly, the court imposed a sentence of 63 years' imprisonment.

## II. ANALYSIS

On appeal, defendant raises three issues. First, defendant contends that the trial court erred by basing his sentence in part upon injuries Trinity suffered prior to the date of her death. Second, defendant complains of the trial court's decision to allow Pleasant to testify regarding statements made by certain individuals. Third, defendant asserts that the trial court failed to consider relevant mitigating evidence.

### A. Prior Abuse

■ We find defendant's first contention, that the trial court erred in considering Trinity's prior injuries, ill taken. Initially, defendant argues that these prior acts of abuse should not have been considered because he was neither charged with nor convicted of them. This is simply not the law of this state. It is well established that evidence of other crimes is admissible at sentencing regardless of whether the defendant was charged with or convicted of the crimes. *People v. Ward*, 154 Ill. 2d 272, 334 (1992); *People v. Thomas*, 137 Ill. 2d 500, 547 (1990); *People v. Spears*, 221 Ill. App. 3d 430, 437 (1991).

■ Defendant next relies on *People v. Rodriguez*, 275 Ill. App. 3d 274 (1995), in support of his argument. Defendant asserts that, on facts similar to the instant case, the *Rodriguez* court held that a trial court could not consider prior acts of abuse against a murdered child in fixing an appropriate sentence for the murder. *Rodriguez*, however, does not stand for this proposition. *Rodriguez* held that prior acts of abuse that neither caused nor were inflicted contemporaneously with the victim's death could not be considered in determining whether the defendant was eligible for an extended-term sentence. *Rodriguez*, 275 Ill. App. 3d at 290. It did not hold that such acts were inadmissible for determining the length of a sentence within the applicable statutory range.

Defendant further argues that insufficient evidence tied Trinity's prior injuries to conduct by defendant. We disagree. Defendant admitted that he had caused the infant's injuries; however, he asserted that they resulted from accidents. The trial court rejected this assertion. This court rejected a similar argument in a slightly different context in *People v. Turner*, 193 Ill. App. 3d 152 (1990). The question in that case was whether the evidence was sufficient to sustain a conviction of involuntary manslaughter of a 2½-year-old child. *Turner*, 193 Ill. App. 3d at 157. The defendant claimed that no history of abuse had been presented, no one ever saw the defendant strike the child, and the child's injuries were caused by a fall down the stairs. This court held that the jury reasonably could have concluded that the defendant had abused the child. *Turner*, 193 Ill. App. 3d at 157. Several bruises found on the child were inconsistent with the defendant's story. Further, a doctor testified that the injuries were inconsistent with a fall down a flight of stairs. Similarly, in the instant case, Dr. Blum testified that the injuries he discovered on Trinity were not consistent with a fall down the stairs. We also note that defendant admitted to Pleasant that he had lied about the alleged incident in which he claimed Trinity fell through the bottom of her cradle. Given Dr. Blum's testimony, the fact that defendant was Trinity's primary caretaker and sole caretaker for a portion of the day after Issacson returned to work on December 13, and defendant's equivocal statements to investigators as to the cause of Trinity's injuries, the trial court was entitled to reject his claim that the injuries were accidental. Discounting defendant's claim of accident, his admission that he caused the injuries provided a sufficient basis for the trial court to base a lengthy sentence upon them.

Defendant also briefly complains that Issacson did not testify and instead simply read a victim-impact statement. Our reading of the trial court's decision indicates to us that the trial court did not rely on

Issacson's statement in concluding that defendant caused Trinity's prior injuries. Rather, the court relied on its rejection of defendant's claim of accident. Accordingly, whether defendant was entitled to cross-examine Issacson on this point is irrelevant. Further, we note that if defendant believed Issacson had something to say that would have benefitted him, he could have called her as a witness.

## B. Hearsay

Defendant next alleges error in the trial court permitting Pleasant to read statements of individuals he interviewed during the sentencing hearing. Specifically, defendant complains of the statements Pleasant took from Robin Rowe and April Paszkiewicz. Defendant asserts that the trial court should have required the information contained in these statements to be presented through live testimony.

■ The ordinary rules of evidence that apply during the guilt phase of a trial do not apply during a sentencing hearing. *People v. White*, 241 Ill. App. 3d 291, 304 (1993). Generally, evidence is admissible so long as it is relevant and reliable. *Spears*, 221 Ill. App. 3d at 437. Hearsay is admissible. *People v. Ivy*, 313 Ill. App. 3d 1011, 1019 (2000). In fact, "[h]earsay evidence of crimes that did not result in prosecution or conviction is *** admissible at the aggravation and mitigation phase if it meets the requirements of relevancy and reliability." *People v. Williams*, 181 Ill. 2d 297, 331 (1988). At a sentencing hearing, the hearsay nature of evidence is a matter of weight rather than admissibility. *People v. Jett*, 294 Ill. App. 3d 822, 830 (1998). Double hearsay, however, should be corroborated. See *People v. Hall*, 194 Ill. 2d 305, 353 (2000). The decision to admit particular types and sources of evidence during a sentencing hearing lies within the broad discretion of the sentencing judge. *People v. Tigner*, 194 Ill. App. 3d 600, 607 (1990).

■ Thus, the mere fact that Pleasant's recounting of Rowe's and Paszkiewicz's statements constituted hearsay is insufficient to support defendant's claim of error. Despite its hearsay nature, Pleasant's testimony was admissible if it was both relevant and reliable. It was obviously relevant, as it pertained to defendant's past misconduct. *People v. Cortes*, 181 Ill. 2d 249, 290 (1998). Further, these statements also displayed indices of reliability.

First, both statements described a similar pattern of domestic abuse perpetrated against females with whom defendant was engaged in a relationship. Rowe stated that defendant told her that he had "beat up" his former wife; Paszkiewicz related that defendant had given her a "fat lip." Defendant disingenuously argues that Paszkiewicz never stated that defendant had "beaten her up." We find her

statement regarding defendant giving her a "fat lip" sufficiently corroborative of being beaten up. We also note that Paszkiewicz's statement that defendant often talked about suicide is consistent with Liotta's testimony regarding defendant's self-inflicted injuries and defendant's statement to Pleasant that he wanted to kill himself.

Regarding Rowe, defendant asserts without explanation, "The circumstances of [his and Rowe's] break up were unknown but it seems logical to infer that the split was not Rowe's decision. Therefore, her unexamined information is likely to be merely the product of a bitter former lover." This inference escapes us. Similarly, defendant nakedly asserts that Paszkiewicz's "information appeared to be merely the product of an embittered ex-wife." We find these contentions unpersuasive. Both women related that defendant did not use drugs and drank only moderately. Thus, their statements were not limited to things that would be prejudicial to defendant. If their statements were the product of bitterness arising from failed relationships, it is likely that positive facts would have been omitted. In the same vein, Rowe stated that defendant never struck her.

In sum, we hold that the trial court did not abuse its discretion in admitting these statements. They were clearly relevant. They were also reliable in that they were consistent with each other, partially corroborated, and not wholly prejudicial to defendant. We find no error here.

## C. Mitigating Evidence

■ Defendant next contends that the trial court failed to consider relevant mitigating factors. Specifically, he contends that the court did not consider his mental illness, his horrific childhood, his acceptance of responsibility for Trinity's death, and his rehabilitative potential. Defendant's contentions are not supported by the record.

The determination of an appropriate sentence lies within the discretion of the trial court, and we will not disturb that determination absent an abuse of that discretion. *People v. Hatfield*, 257 Ill. App. 3d 707, 710 (1994). A trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation. *People v. C.H.*, 255 Ill. App. 3d 315, 334 (1993). The weight attributed to such factors depends on the circumstances of a given case. *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994). A trial court is in the best position to take into account such factors as " 'the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age' [citation][,] whereas the appellate court has to rely entirely on the record." *People v. Streit*, 142 Ill. 2d 13, 19 (1991), quoting *People v.*

*Perruquet*, 68 Ill. 2d 149, 154 (1977). Accordingly, a court of review must not substitute its judgment for that of a trial court merely because it would have weighed aggravating and mitigating factors differently. *Streit*, 142 Ill. 2d at 19. Further, when mitigating evidence is before the trial court, the court is presumed to have considered it. *Dominguez*, 255 Ill. App. 3d at 1004. A defendant must point to something beyond the sentence itself to establish that such evidence was not considered. *Dominguez*, 255 Ill. App. 3d at 1004.

Defendant first contends that the trial court failed to consider his mental illness. However, the trial court expressly considered defendant's condition, stating, "When I consider the bipolar disorder is [*sic*] mitigating it is something that cuts both ways." Hence, defendant's claim that the trial court ignored this evidence is flatly wrong. Even if we were inclined to attribute more weight to this evidence, we would not do so, for that is a function for the trial court to perform. *Streit*, 142 Ill. 2d at 19.

Defendant's assertion that the trial court ignored his dysfunctional childhood is really nothing more than an invitation for us to reweigh this evidence. Defendant acknowledges the trial court's statement that defendant "had a dysfunctional childhood." Thus, this evidence was considered, and we will not now reweigh it.

Defendant next argues that his sentence should have been reduced because he pleaded guilty and accepted responsibility for his actions. Initially, we note that defendant entered an *Alford* plea—pleading guilty while maintaining his innocence. See *Alford*, 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160. Proceeding in this manner is, at best, an equivocal acceptance of responsibility. See *State v. Williams*, 937 S.W.2d 330, 334 (Mo. App. 1996) ("A subsequent guilty plea pursuant to *Alford* eliminates any showing of remorse or taking of responsibility by the appellant"); *United States v. Harlan*, 35 F.3d 176, 181 (5th Cir. 1994). Moreover, in his statement of allocution, defendant continued to maintain that Trinity's death was accidental. Further, the trial court was aware that defendant had entered a guilty plea. Defendant points to nothing beyond his sentence itself in arguing that this factor was not considered; hence, the trial court presumptively considered it. *Dominguez*, 255 Ill. App. 3d at 1004. We perceive no acceptance of responsibility sufficient for us to conclude that the trial court abused its discretion in imposing a 63-year sentence.

Finally, defendant contends that the trial court did not take into account his potential for rehabilitation. We disagree. Immediately before imposing the sentence, the trial court stated, "[Y]our history establishes, your condition establishes that you're going to be violent again." Thus, the trial court expressly found that defendant's potential for rehabilitation was dubious.

To conclude, we find no abuse of discretion on the part of the trial court in sentencing defendant. The evidence defendant alleges was not considered was presented to the trial court, and the trial court expressly addressed most of it while imposing the sentence. It is not our role to reweigh this evidence. See *Streit*, 142 Ill. 2d at 19.

## III. CONCLUSION

In light of the foregoing, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

O'MALLEY and BYRNE, JJ., concur.