NO. 4-04-1054     Filed: 2/14/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| LISA DAWN SCOTT, | ) | No. 03CF944 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James E. Souk, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

In June 2004, defendant, Lisa Dawn Scott, pleaded guilty to one count of involuntary manslaughter for unintentionally and recklessly killing her newborn daughter (720 ILCS 5/9-3(a) (West 2002)).  She was sentenced to 12 years in prison.  The trial court denied defendant's motion to reconsider.  Defendant appealed.  We affirm.

## I. BACKGROUND

On March 7, 2003, a garbage collector emptied a Dumpster from behind an apartment complex.  As he started the compactor, he noticed what looked like an infant's hand and umbilical cord hanging from the trash compactor.  The police were called.  An infant, packaged in a trash bag along with a bloodstained T-shirt, sock, and towel, was extracted from the compactor and taken to the morgue for an autopsy.

The doctor conducting the autopsy, Dr. Bryan Mitchell, determined the infant to be a full-term female weighing slightly under 6 pounds and measuring 18 1/4 inches long.  The umbilical

cord was cut. An air bubble in the infant's stomach and air in her lungs indicated she was born alive and took a breath. Dr. Mitchell could not determine how many breaths were taken. According to Dr. Mitchell, the cause of death was asphyxia caused by one of the following: (1) placement in the closed plastic bag, (2) smothering without oral or nasal trauma, (3) hemorrhage as a result of severing the umbilical cord without clamping, or (4) a combination of these.

Five days after the infant was discovered, the police, acting on a tip, contacted Cody Wimp, who lived in a mobile home with David Whalen, defendant's on-again, off-again boyfriend of four years. Cody consented to a search of the trailer and told police that on the evening of March 7, 2003, he noticed the bath mat was wet with blood and saw smeared blood on the shower and shower curtain as well as blood in front of the toilet. Cody had called his mother to ask how to clean up the blood, then cleaned the bathroom with a bleach solution.

On the same day the police searched Cody's trailer, defendant learned that the police were looking for her and called them. At that time, defendant, a student at the local community college, was in Florida on a spring-break trip. She and some girlfriends had left for the trip the night of March 8. During the phone call, defendant denied being pregnant. Defendant returned home early from Florida.

After defendant returned home, deoxyribonucleic acid (DNA) testing was conducted using the infant and defendant's DNA.

The DNA test confirmed the infant was defendant's daughter. Police eventually determined that on the night of March 6, 2003, defendant spent the night with David Whalen at his trailer. Between 3:45 a.m. and 6:45 a.m. on March 7, defendant entered the trailer's bathroom, which was immediately adjacent to Whalen's bedroom, and gave birth to the infant. Defendant claims she never saw the baby breathe, heard the baby cry, or saw the baby move. Defendant does not remember cutting the umbilical cord. After the birth, defendant cleaned the bathroom, got a trash bag from the trailer's kitchen, and placed the baby and other blood-soaked items into the trash bag. She went back to bed with Whalen but got up before he did and told him she would take out the trash. On her way back to her apartment, defendant dumped the trash bag containing the infant in a full Dumpster behind an apartment complex. Defendant then went to work for most of the day. That night she left with seven other friends for Florida.

In September 2003, a grand jury indicted defendant for two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2002)), involuntary manslaughter (720 ILCS 5/9-3(a) (West 2002)), and concealment of a homicidal death (720 ILCS 5/9-3.1(a) (West 2002)). The State later charged defendant with another count of involuntary manslaughter to which defendant agreed to plead guilty in exchange for the State to nol-pros the other counts. According to the charge, defendant either separated or caused the separation of her child from the placenta. Erroneously believing the child to be dead, defendant failed to clamp

the umbilical cord, clear the airway passage, or seek medical attention. Defendant then placed the infant in a plastic bag. The act or combination of acts resulted in the death of defendant's daughter. The plea agreement stated defendant could be sentenced to a minimum of 3 years and a maximum of 14 years in prison with no possibility of probation.

At the sentencing hearing, the State called officers who testified to the manner in which the infant was found and the items found in the search of defendant's room. The State introduced pictures of the infant after it was extracted from the garbage compactor and pictures of a jar of stretch-mark cream, anatomy and physiology books, and pictures of defendant in Florida, all items found during a search of defendant's room.

The State subpoenaed some of the girls who accompanied defendant to Florida. The girls testified that no one knew defendant was pregnant or had just given birth. While in Florida, defendant drank and "partied" like everyone else. The State presented photographs of her in Florida smiling, sunbathing, and drinking. None of the girls knew why defendant left the trip early at the time except that the police were looking for her. The girls testified that they were acquainted with defendant through the community college. Defendant had been taking an anatomy and physiology course at the community college in hopes of pursuing a career in nursing.

None of defendant's family or friends knew defendant was pregnant. Defendant's older sister was subpoenaed by the

State and testified that she had a son out of wedlock and her parents and family had been very supportive of her. Defendant was close with her family, good with children, and spent many nights out of the week with her recently widowed grandmother. The sister testified defendant was extremely shy when not under the influence of alcohol.

Defendant presented a number of witnesses. Defendant's childhood friend testified she was extremely shy when not drinking. The friend stated defendant was good with children and took care of others but would never ask for help for herself. Defendant's aunt and mother testified along the same lines. None of defendant's family or friends knew that defendant had previously been pregnant in 2001 and had a miscarriage. A church leader testified at the sentencing hearing that defendant met with him regularly after the incident. He characterized her as involved in the church from a young age and recommitted to her spirituality.

Finally, Dr. Robert Chapman, a forensic psychiatrist, testified defendant suffered from four disorders: (1) social anxiety disorder; (2) adult attention deficit disorder, inattentive type; (3) dysthymic disorder, which is chronic, long-standing, low-grade depression; and (4) personality disorder, obsessive-compulsive type. Dr. Chapman explained defendant's social anxiety disorder made her painfully shy, but she could gain temporary relief from excessive use of alcohol. Using alcohol excessively and frequently allowed her to have friends,

date, go out, and seem outgoing and fun. Defendant's adult attention deficit disorder manifested itself in excessive day-dreaming and creation of a fantasy life. According to Dr. Chapman, defendant could make herself believe that bad, painful, or stressful things were not happening. Defendant dealt with anything unpleasant by believing if she ignored it and went into her fantasy life, the unpleasantness would go away and everything would turn out all right. Dr. Chapman's testimony was not refuted.

Aside from traffic tickets, defendant had no prior record.

In sentencing defendant consistent with the State's recommendation of 12 years in prison, the trial court stated it had "substantial questions about whether the facts of this case, as related to the court, supported [the plea]." The court continued, "After due consideration, research[,] and input from counsel, the [c]ourt accepted this plea. It was reached between the defendant and the State, allowing the defendant to have murder charges against her dismissed." The court then expressed what a difficult case this was. After acknowledging defendant's claim that she had been in denial leading up to the event on March 7, the court stated "that is rather difficult for the [c]ourt to process very well, considering what else is known about Miss Scott." The court went on to relate that when this happened, defendant was 20 years old, bright, educated, studying nursing, and had previously been pregnant. The court found there

was "much evidence" to contradict Dr. Chapman's diagnoses, namely "[t]here is no indication in the life of this young woman of anyone thinking that she was strange or bizarre or needed mental health treatment."

The trial court then recounted the following concerning the victim in this case,

"There is a victim in this case named only Jane Doe, and once that child was born and took breath, that child became a citizen of our community and of our country and had the right to live. Because of circumstances that were created by the reckless and irresponsible behavior of Miss Scott, this child lived only a few minutes ***. By [defendant's] behavior, this child, the most innocent and precious human being that could be imagined, is not with us, was denied her right to live when it was so preventable. *** [T]his was a full-term baby. The [c]ourt has before it a picture of this child. This is not a situation in which it is an early-term child and might be more a blob of tissue or something like that, that you might describe as something not discernible as a child. This is a baby that was born into a toilet and her mother cut the umbilical cord, somehow allowed this child

to die with no help, no medical care."

At the hearing on defendant's motion to reconsider sentence, the trial court reaffirmed what a difficult matter this case presented. The court stated:

"The [c]ourt, in imposing the sentence that it did, while taking all the mitigation into effect, also considered some other things which are facts that the [c]ourt considered quite aggravating. Certainly, the evidence alluded to by [the State] regarding the defendant's immediately going to Florida and, if you will, the impact or, if you will, lack of impact on her life from this even having just occurred was, well, gave the [c]ourt some significant insight into this incident and the defendant's, if you will, almost blas[é], somewhat callous attitude about the whole matter ***. The defendant's prior pregnancy obviously was not a crime, but that, coupled with her nursing training, her education, and her background, the over-all nature of this offense and the, her attitude and, reaction to this and, and a trip to Florida, and without attempting to recite everything about it, the [c]ourt just reached the conclusion, *** even with the

mitigation presented, considered that the scope of the recklessness which resulted in the death of this child, was so egregious that a sentence near the maximum was appropriate, even for a young woman with the defendant's substantially, otherwise substantially mitigating background."

This appeal followed.

## II. ANALYSIS

Defendant argues that the trial court erred (1) by considering and ascribing weight to the victim's character and status, defendant's behavior after the offense, and defendant's alleged study of nursing and (2) by using factors inherent in involuntary manslaughter as aggravating factors. The State responds that defendant forfeited her right to appeal by not filing a motion to withdraw her negotiated guilty plea pursuant to Supreme Court Rule 604(d) (188 Ill. 2d R. 604(d)). Further, the State argues that, even if defendant may appeal, defendant forfeited many of the issues she discusses in this appeal by not including them in her motion to reconsider sentence. Finally, the State argues the court did not abuse its discretion in sentencing defendant.

### A. Defendant's Right To Appeal

The State argues this court may not consider the merits of defendant's claims because defendant failed to file a motion to withdraw her negotiated plea as required in Supreme Court Rule

604(d) (188 Ill. 2d R. 604(d)).  Defendant did not have to file a motion to withdraw her plea because her plea was not "negotiated" as defined by Supreme Court Rule 604(d) (188 Ill. 2d R. 604(d)).

The plea agreement provided that the offense was non-probational and defendant may be sentenced to a term of 3 to 14 years' incarceration.  Under section 9-3(f) of the Criminal Code of 1961 (Criminal Code), "[i]n cases involving involuntary manslaughter in which the victim was a family or household member *** the penalty shall be a Class 2 felony, for which a person if sentenced to a term of imprisonment, shall be sentenced to a term of not less than 3 years and not more than 14 years."  720 ILCS 5/9-3(f) (West 2002).  Aside from removing the possibility of probation, the plea agreement did no more than restate the statutorily imposed sentencing range.

At the sentencing hearing, the trial court admonished defendant by stating, "when you do a plea such as you have done, the only way that you are allowed to appeal is to file within 30 days a written motion to withdraw your plea."  During the hearing on defendant's motion to reconsider sentence, though, the court stated it would entertain defendant's motion because "14 was really the maximum here, in which event, while the defendant bargained away her right to seek probation, it's still in essence, was therefore an open plea as opposed to a cap plea."

The Supreme Court of Illinois has recognized four types of pleas.  People v. Diaz, 192 Ill. 2d 211, 218, 735 N.E.2d 605, 608 (2000).  First is the "open" plea, "wherein the defendant

pleads guilty 'without receiving any promises from the State in return'" and both the State and defendant may argue for any sentence permitted by statute. Diaz, 192 Ill. 2d at 218, 735 N.E.2d at 609, quoting People v. Evans, 174 Ill. 2d 320, 332, 673 N.E.2d 244, 250 (1996). Under the open plea, defendant may appeal after filing a motion to reconsider sentence in the trial court. 188 Ill. 2d R. 604(d). The remaining three types of pleas are categorized as "negotiated pleas." Diaz, 192 Ill. 2d at 219, 735 N.E.2d at 609. If a plea is negotiated, a defendant must file a motion to withdraw the plea of guilty and vacate the judgment before she can appeal. 188 Ill. 2d R. 604(d). One of the three types of negotiated pleas occurs when a "defendant pleads guilty in exchange for the State's agreement to dismiss other pending charges and make sentencing concessions." Diaz, 192 Ill. 2d at 221-22, 735 N.E.2d at 610.

The State argues the plea in this case is a negotiated plea because defendant was eligible for an extended term of 7 to 14 years (730 ILCS 5/5-8-2(a)(4) (West 2002)) as a result of having committed the felony against a person under 12 years of age at the time of the offense (730 ILCS 5/5-5-3.2(b)(4)(i) (West 2002)). The plea was, therefore, a negotiated plea because it made a sentencing concession by agreeing to a minimum sentence of three years instead of seven. Also, the agreement foreclosed the possibility of probation.

In recognizing that a plea is negotiated when the State makes concessions, the Supreme Court of Illinois noted that

"[u]nder this circumstance, the State's ability to argue for the full range of penalties provided for in the Code of Corrections is constrained by the parameters of its agreement with the defendant." Diaz, 192 Ill. 2d at 222, 735 N.E.2d at 610. In this case, the State was in no way constrained by the agreement. The State could have argued a 7-year sentence was appropriate and, in fact, did argue that a 12-year sentence was appropriate. Further, removing probation as a possibility is clearly not a concession. The State was not unfairly bound "to the terms of the plea agreement while *** defendant [had] the opportunity to avoid or modify those terms." People v. Linder, 186 Ill. 2d 67, 74, 708 N.E.2d 1169, 1173 (1999).

## B. Forfeiture

The State argues that most of defendant's claims on appeal are forfeited because she failed to include them in her motion to reconsider sentence. According to the State, defendant's motion to reconsider sentence did not raise issues regarding the trial court's improper consideration of nonstatutory aggravating factors, except for the claim that the trial court emphasized the nature of the deceased child of defendant. The Supreme Court of Illinois has recognized that "[t]he plain[-]error doctrine may be used in reviewing a sentence if the evidence is closely balanced." People v. Martin, 119 Ill. 2d 453, 458, 519 N.E.2d 884, 886 (1988). The evidence at the sentencing hearing was closely balanced so, regardless of whether defendant's claims were forfeited, we would still apply the plain-

error rule and address the appeal on the merits.

C. Defendant's Sentence

Defendant first argues that the trial court considered improper aggravating factors in sentencing her; specifically, her alleged study of nursing, her behavior after the offense, and the victim's character and status. Further, defendant argues that the court engaged in double enhancement by considering the infant's death and her familial relationship as defendant's daughter as aggravating factors.

A defendant's sentence will not be overturned unless the trial court abused its discretion. People v. Perruquet, 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884 (1977). While the evidence presented in the sentence hearing was closely balanced, we cannot say the court abused its discretion.

1. Aggravating Factors

In determining a sentence, the trial court may consider nonstatutory factors in aggravation. People v. Zehr, 143 Ill. App. 3d 875, 879, 493 N.E.2d 727, 729 (1986). Defendant argues the trial court improperly considered three nonstatutory factors in aggravation.

Defendant first argues that the trial court placed weight and importance on the fact that she had studied nursing. Defendant's education may be considered in determining the recklessness of the offense. Defendant, though, was not studying nursing. While defendant's career aspiration was to go to nursing school, she had only taken some science classes at the

local community college.  While the court misstated defendant's education, the court did not appear to give this factor undue weight.  Misstating defendant's education does not rise to an abuse of discretion.

Next, defendant claims the trial court improperly considered the character and status of the victim.  In support of this claim, defendant cites the court's comment, "[b]y [defendant's] behavior, this child, the most innocent and precious human being that could be imagined, is not with us, was denied her right to live when it was so preventable."  Further the court stated,

> "Well, this was a full[-]term baby.  The [c]ourt has before it a picture of this child.  This is not a situation in which it is an early-term child and it might be more a blob of tissue or something like that, that you might describe as something not discernable as a child.  This is a baby that was born into a toilet and her mother cut the umbilical cord, somehow allowed this child to die with no help, no medical care."

The court's comments, while acknowledging the victim's status as an infant, taken in context, appear to be comments on the nature and circumstances of the baby's birth and death.  People v. King, 151 Ill. App. 3d 662, 663, 503 N.E.2d 365, 367 (1987) (courts may consider the circumstances and nature of the offense).  The

comments do not clearly indicate that the court improperly considered the character and status of the victim.

Finally, defendant argues the trial court erroneously penalized her for lawful behavior after the commission of the offense, namely her going on a spring-break trip. Considering defendant's actions of throwing her baby in a plastic bag, dumping her baby's body in a Dumpster, and then going on a spring-break trip less than 24 hours later was not improper. The court was not penalizing defendant for engaging in lawful behavior. The court was considering the circumstances surrounding the offense and disposal of the body. Defendant's recklessness was exacerbated by the fact that she not only failed to seek medical attention for the baby, but she also put her baby in a plastic bag, dumped her in the garbage, and left the state.

The record does not indicate that the trial court abused its discretion by sentencing defendant for improper reasons.

## 2. Double Enhancement

Involuntary manslaughter is ordinarily a Class 3 felony (720 ILCS 5/9-3(d) (West 2002)) unless the victim is a family member, and then it becomes a Class 2 felony with a sentencing range double that of a Class 2 felony (720 ILCS 5/9-3(f) (West 2002)). Defendant argues that, in the enhanced version of manslaughter to which defendant pleaded guilty, both death and family status are intrinsic in the charge itself. According to defendant, the trial court used the familial relationship as

rationale for imposing a sentence two years shy of the maximum. The State referred to the victim as daughter, niece, and grand-daughter in its closing remarks, and the trial court referred to defendant's daughter and "this child" when handing down the sentence. Further, defendant cites the following references made by the court: "this child *** was denied her right to live," "somehow allowed this child to die," and "there was one person on earth who was able to preserve this child's right to live."

This court has found that a parent holds a special duty of protection to her child over and above the duty she might owe another family member. People v. Burke, 226 Ill. App. 3d 798, 800-01, 589 N.E.2d 996, 998 (1992). Because of this special duty, a sentencing court does not err when it considers the parental relationship at sentencing even when the defendant's status as a "family member" is an element of the crime. Burke, 226 Ill. App. 3d at 800-01, 589 N.E.2d at 998. In this case, therefore, the trial court did not err in considering the victim was defendant's daughter.

Finally, defendant's assertion that the trial court considered the infant's death in aggravation is not clearly supported by the record. While the court referred to the fact that the child died, the court did so in describing the nature and circumstances of the offense. The court never indicated that it considered the infant's death as an aggravating factor.

Despite all of the factors in mitigation, including the forensic psychiatrist's unopposed testimony and defendant's

behavior in conformity with the psychiatrist's diagnoses, the record does not indicate that the trial court abused its discretion in sentencing defendant within the sentencing range, a range to which defendant specifically agreed in her plea agreement. See People v. Ratzke, 253 Ill. App. 3d 1054, 1074, 625 N.E.2d 1004, 1018 (1993) (the trial court did not err in giving little weight to evidence of the defendant's mental disturbance when sentencing him to a natural life sentence for murder); People v. Bilski, 333 Ill. App. 3d 808, 820, 776 N.E.2d 882, 891 (2002) (in sentencing a defendant, the trial court must determine the weight to be given to evidence of mental illness, and a reviewing court will not disturb that determination).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN and KNECHT, JJ., concur.