2024 IL App (2d) 240016-U
No. 2-24-0016
Order filed November 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-291 |
| THERESA M. STOEN | ) ) ) | Honorable Tiffany E. Davis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice McLaren and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In defendant's appeal of her three-year prison sentence for concealment of a death, (1) the trial court properly considered in aggravation defendant's status as a certified nursing assistant because it bore on the moral character of her decision to hide the victim's body rather than seek medical assistance, (2) imposition of the three-year maximum sentence was not an abuse of discretion despite the existence of several mitigating factors, and (3) the probation sentence for codefendant, defendant's daughter, was not improperly disparate to defendant's prison sentence because the two were not similarly situated.

¶ 2    Defendant, Theresa M. Stoen, entered a nonnegotiated plea of guilty to a single count of

concealment of a death (720 ILCS 5/9-3.5(b) (West 2020)). The trial court sentenced defendant to

the maximum three-year prison term. Defendant argues on appeal that (1) the trial court considered

an improper factor in imposing sentence, (2) imposition of the maximum prison term was an abuse of discretion, and (3) her sentence was disparate to the sentence of probation imposed on her codefendant for the same offense. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       In June 2022, defendant and her daughter, Mikalah Stoen, were each indicted on two counts of concealment of a death, all arising from the same incident (*id.* § 9-3.5(b), (c)). In May 2023, defendant entered a plea of guilty to one of the counts, a Class 4 felony (*id.* § 9-3.5(d)) punishable by, *inter alia*, a prison term of one to three years (see 730 ILCS 5/5-4.5-45 (West 2020)). The State provided the following factual basis for the plea:

>         "If this matter were to proceed to trial, the [S]tate would prove beyond a reasonable doubt that on or about April 28, 2022, *** defendant *** committed the offense of concealment of a death, in that said defendant knowingly concealed the [death] of [Alexander Michael Oleston], in that the defendant caused the deceased body of [Oleston] to be concealed, in that the defendant placed his body in the tall grass area of the North Branch Conservation [A]rea located in Richmond, Illinois [(the conservation area)], for the purpose of preventing or delaying the discovery of his death."

(The record elsewhere indicates that Oleston's body was discovered at the conservation area by a staff member on April 28, 2022, the same day defendant placed him there.) In exchange for the plea, the State dismissed the remaining count against defendant. There was no agreement on the sentence. The trial court set the matter for sentencing.

¶ 5       A presentence investigation report (PSI) was prepared for defendant's sentencing. The PSI noted that, on April 30, 2022, defendant, Mikalah, and Joseph Lapenta approached the police to

discuss the incident. The three were interviewed separately. Lapenta reported that he lived with Mikalah but was not involved in the incident.

¶ 6     Mikalah gave the police the following account. She met Oleston on April 27, 2022, and invited him to smoke marijuana with her at her home the following day. At some point, while Oleston was in the bathroom, Mikalah heard a " 'thump' " and found him on his hands and knees. She helped him to the toilet and gave him water. He started vomiting. Mikalah checked on him every five minutes and eventually found him unresponsive, at which point she called defendant. When defendant arrived, she told Mikalah to call 911. Mikalah said she did not want to call the police because she had a pending case involving marijuana and wished to avoid further trouble. At defendant's suggestion, Mikalah administered Narcan, but Oleston remained unresponsive. Mikalah and defendant then wrapped Oleston's body in a blanket and placed him in defendant's car. They drove to the conservation area and left the body.

¶ 7     Defendant told the police that Mikalah called her and said she needed help because Oleston was sick in her bathroom. Upon arriving, she saw Oleston "propped up against the toilet." Mikalah administered Narcan to Oleston; he "gurgled, and his color came back." Defendant wanted to call 911, but Mikalah, who had pending charges for selling marijuana, did not want to do so. Defendant "sternum rubbed" Oleston and checked his vital signs with her stethoscope, but she could not detect a pulse. Defendant "advised that they move the body and take him to the conservation area. They proceeded to do so."

¶ 8     Defendant gave the PSI writer the following version. On April 28, 2022, she received a phone call from Mikalah, who told her that a man she was with had collapsed. Defendant traveled to Mikalah's location and observed a man, later identified as Oleston, lying in the bathroom. Defendant administered Narcan to Oleston and performed a sternum rub, but Oleston did not

respond. Defendant estimated that Oleston had been dead for at least 40 minutes before her arrival. Defendant repeatedly told Mikalah to call the police. Mikalah refused, expressing fear that she would go to jail. When the PSI writer asked defendant why she did not call the police despite Mikalah's wishes, she responded that she had " 'no train of thought and became a follower.' " Defendant reported that she and Mikalah moved Oleston's body to defendant's car, drove it to the conservation area, and left it on the ground. At that time, defendant "felt remorse *** and wasn't sure if she should place flowers over [Oleston's] body or pray over him." Because her conscience bothered her, she turned herself in to the police a few days later.

¶ 9    Defendant reported that she did not complete high school or obtain a GED but had been a Certified Nursing Assistant (CNA) and medical technician for 24 years. She was employed by Burr Oaks Manor in Genoa City, Wisconsin, where her duties included working in the kitchen, housekeeping, and assisting residents. Defendant had received numerous citations in Wisconsin and Illinois for traffic violations, including driving with a suspended license, operating an uninsured vehicle, and operating a vehicle without proof of insurance. At the time of the offense, defendant was on bond in connection with a McHenry County charge of driving with a suspended license (DWSL). (She also had "an outstanding warrant for failing to appear on a traffic violation," but it is unclear if this was the DWSL charge.) She was later placed on court supervision for DWSL. The PSI did not reflect any prior convictions of nontraffic offenses.

¶ 10    In her statement in allocution, defendant noted that she had no prior contact with the police and had been a CNA for 24 years. Encountering Oleston's body was "devastating and traumatizing" for her, and she "didn't know what to do at the time." She should have called 911 but did not do so because her maternal protective instincts "kicked in," and she was fearful because

she "had a warrant for [her] arrest because of a suspended registration[.]" She felt "deep remorse, not only for [Oleston], but [also] for his family and friends."

¶ 11    The trial court sentenced defendant to the maximum prison sentence of three years and imposed six months of mandatory supervised release. In pronouncing sentence, the court noted that it had considered all pertinent aggravating and mitigating factors. In aggravation, the court noted that defendant's conduct caused or threatened serious harm. See 730 ILCS 5/5-5-3.2(a)(1) (West 2022). The emotional impact on Oleston's family included not knowing the circumstances of his death, particularly whether he was actually dead when defendant disposed of him. The court also found that an appropriate sentence was necessary to deter others from committing the same crime. See *id.* § 5-5-3.2(a)(7). The court further commented that "[d]efendant [held] a position of trust or authority in the community to the extent that she [was] a CNA." The court observed that although defendant took responsibility for concealing Oleston's death, she did so "two days too late." The court added, "I don't know that [defendant] even [knew] whether or not [Oleston] was alive at the time that [she] put his body in the trunk *** and took him to the conservation area." The court also noted that defendant committed the offense while on bond for a traffic violation.

¶ 12    In mitigation, the trial court found that defendant had generally led a law-abiding life and that she expressed genuine remorse for the incident. Further factors in mitigation were that (1) defendant did not contemplate that her conduct would cause the serious harm it did (see *id.* § 5-5-3.1(a)(2)); (2) her explanation for her actions constituted substantial grounds tending to excuse or justify her criminal conduct, without establishing a defense (see *id.* § 5-5-3.1(a)(4)); (3) the offense was the result of circumstances not likely to recur (see *id.* § 5-5-3.1(a)(8)); and (4) she was likely to comply with the terms of a period of probation (see *id.* § 5-5-3.1(a)(10)).

¶ 13    After the three-year sentence was imposed, defendant moved to reconsider her sentence, arguing, *inter alia*, that (1) the trial court erred in considering as an aggravating factor that defendant, as a CNA, occupied a position of trust or authority in the community; and (2) defendant's sentence was an abuse of discretion. The court denied the motion. As to the first argument, the trial court noted that it was defendant who mentioned in allocution that she had been a CNA for 24 years. The court continued:

"In this case she also indicated going into protective mode for her daughter, *** and I think that's kind of where the—[i]t's not that [Oleston] was alive [and] depending upon her to do something. I don't have hard evidence to that effect, although there was some inconsistency with what happened once he was given Narcan. That made it sound like maybe he was alive in that moment because he did respond briefly. But then other parts were denials by the defendant, I believe if I recall correctly, that that had actually happened.

Her daughter called her, and, really, when a child calls their parent, they're looking for guidance, and, you know, her mom was a CNA. And so if anyone was really relying upon their mother, it arguably was her daughter and her daughter knowing her mom's experience and mom might know better what to do than she did. And then the State argued the defendant had medical training, the defendant had medical experience, *** because if anyone should have known the importance of calling 911, if anyone there could have appreciated the importance of trying, it was her. She was the trained nurse. She was the parent there."

As to defendant's second argument, the court reaffirmed that the sentence was appropriate under all the circumstances.

¶ 14    On September 11, 2023, defendant filed a timely notice of appeal. On November 2, 2023, Mikalah, who had also pleaded guilty to concealment of Oleston's death, was sentenced to a 30-month term of probation. On November 17, 2023, defendant filed a motion in this court for a summary remand to the trial court because defense counsel failed to file a certificate of compliance with Illinois Supreme Court Rule 604(d) (eff. Oct. 19, 2023). We granted the motion.

¶ 15    On remand, defense counsel filed a Rule 604(d) certificate and an amended motion to reconsider defendant's sentence. The amended motion reiterated the arguments from the original motion and additionally argued that an impermissible disparity existed between defendant's sentence and Mikalah's. The trial court denied the motion, and this appeal followed.

¶ 16                                        II. ANALYSIS

¶ 17    As we have recently explained:

        "We will not disturb a sentence falling within the statutory range for an offense

        unless the trial court has abused its discretion. [Citation.] Where the sentence falls within

        the statutory range, an abuse of discretion occurs where the court has imposed a sentence

        that greatly varies from the spirit and purpose of the law or is manifestly disproportionate

        to the nature of the offense [citation], or where the sentence does not reflect adequate

        consideration of relevant factors in mitigation or the defendant's rehabilitative potential

        [citation]. Nevertheless, so long as it does not ignore relevant factors in mitigation or

        consider improper factors in aggravation, the court possesses wide latitude in imposing a

        sentence. [Citation.] We also presume that the court has considered all relevant evidence

        in mitigation, absent some affirmative indication to the contrary beyond the sentence itself.

        [Citation.] The existence of mitigating factors neither requires the imposition of the

        minimum sentence nor precludes the imposition of the maximum sentence; rather, the court

must balance all relevant factors and reach a reasoned decision about the appropriate punishment in each case. [Citation.]" *People v. Campos*, 2024 IL App (2d) 230056, ¶ 54. Moreover, "[the] court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

¶ 18    With these principles in mind, we first address defendant's argument that the trial court considered an improper factor in imposing sentence. Defendant notes the trial court's statement that " '[d]efendant [held] a position of trust or authority in the community to the extent that she [was] a CNA.' " Defendant points out that status as a CNA is not listed among the recognized positions of trust or authority in the statutory section on aggravating factors (see 730 ILCS 5/5-5-3.2(a)(14), (a)(29) (West 2022)). However, as defendant acknowledges, the trial court is not limited to the statutory aggravating factors. See *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 38, n.1 ("A trial court is free to consider factors in aggravation that are not specifically listed in a statute."). Still, according to defendant, "[n]o relevant and reliable evidence supported the court's treatment of [defendant's] employment as a CNA as a non-statutory aggravating factor." We disagree.

¶ 19    First, we clarify how the trial court used this factor in aggravation. Although the court initially referred to defendant's status as a CNA as a position of trust and authority *in the community*, the court's comments in denying defendant's postsentencing motion clarified that it considered defendant's CNA training to be a factor in aggravation because it equipped her to identify Oleston's distress and to encourage Mikalah to summon the authorities. Instead of choosing that tack, defendant instead acceded to Mikalah's wishes that emergency personnel not

be contacted and even proposed hiding Oleston's body. We note that questions linger as to whether Oleston possibly could have been revived when defendant decided to dispose of him in a wildlife area. Indeed, defendant told police that, after Narcan was administered to Oleston, he "gurgled, and his color came back."

¶ 20    Second, while defendant claims that "no evidence [was] offered regarding [her] [CNA] training," we note that it was defendant who claimed such training when she provided biographical details for the PSI and asked for leniency in sentencing. Although the precise nature and extent of her medical training are not explicit, she worked at a residential facility that apparently provided at least some healthcare services. Also, she demonstrated medical knowledge by checking Oleston's vital signs—using a stethoscope that she evidently brought along—and by attempting to revive him. It was entirely reasonable for the trial court to conclude that defendant should have recognized that Oleston needed medical help—or, as the trial court remarked, that it was at least worth "trying" to revive him.

¶ 21    Although not precisely analogous, *People v. Scott*, 363 Ill. App. 3d 884 (2006), supports using defendant's status as a CNA as an aggravating factor. In *Scott*, the defendant pleaded guilty to involuntary manslaughter for unintentionally and recklessly killing her newborn daughter. *Id.* at 885. The defendant claimed that after giving birth, she never observed the infant move, breathe, or cry. *Id.* at 886. She placed the infant in a trash bag, which she then placed in a dumpster. *Id.* The doctor who conducted the autopsy concluded that the infant had been born alive and that "the cause of death was asphyxia caused by one of the following: (1) placement in the closed plastic bag, (2) smothering without oral or nasal trauma, (3) hemorrhage as a result of severing the umbilical cord without clamping, or (4) a combination of these." *Id.* At the defendant's sentencing hearing, the State presented evidence that the defendant was enrolled in community college and

taking an anatomy and physiology course in the hope of pursuing a nursing career. *Id.* at 887. In sentencing the defendant, the trial court cited her " 'nursing training' " as an aggravating factor. *Id.* at 889. On appeal, the defendant argued that the trial court erred because she had not been studying nursing as such but had only taken classes with the aim of attending nursing school. *Id.* at 892. The *Scott* court found no error, concluding that the defendant's education, though not in the field of nursing *per se*, was relevant to assessing her recklessness and, thus, was a proper aggravating factor. *Id.*

¶ 22    Here, unlike in *Scott*, defendant was not convicted of homicide, and there is no evidence that Oleston's death was the result of her recklessness. In our view, however, that distinction does not preclude consideration of defendant's recklessness as a factor in aggravation. Whether or not she bore any responsibility for Oleston's death, she not only withheld proper medical assistance from him, but she also actively put him in a position where he was unable to obtain it. This bore on the moral character of defendant's conduct—and thus on her own moral character—which is a legitimate sentencing consideration. See *Fern*, 189 Ill. 2d at 53.

¶ 23    Citing *People v. Zemke*, 159 Ill. App. 3d 624 (1987), defendant argues that even if her status as a CNA entailed medical training, "[she] was no more responsible than the average individual for the well-being of every person she came across." In *Zemke*, the defendant, a volunteer firefighter, pleaded guilty to sex offenses against minors. *Id.* at 625-26. At sentencing, the State argued that the defendant violated his position of trust because he "was obligated to prevent the occurrence of offenses such as the ones he admitted committing." *Id.* at 629. At sentencing, the trial court agreed with the State and found in aggravation that the defendant had violated the public trust by committing the crimes. *Id.* at 627. We held that the defendant's status

as a firefighter was not aggravating because his duties "were related to firefighting and prevention, not the apprehension of criminals or the prevention of crime." *Id.* at 630.

¶ 24    *Zemke* is inapposite. As we have explained, given the particular circumstances of this case, defendant's status as a CNA bore on the moral character of her conduct. Whether, as a general matter, a CNA has any special responsibility for the general public's well-being is entirely beside the point.

¶ 25    We next consider whether the trial court abused its discretion in sentencing defendant to the maximum prison term. It is true that several mitigating factors applied. Notably, defendant generally led a law-abiding life before the offense, showed remorse for the crime, and accepted responsibility by voluntarily contacting the police and pleading guilty without demanding any sentencing concessions in exchange. As noted, however, the existence of mitigating factors does not preclude the imposition of the maximum sentence. *Campos*, 2024 IL App (2d) 230056, ¶ 54. We again stress that defendant was not convicted of a crime entailing responsibility for Oleston's death. Nonetheless, the trial court correctly observed that it was unclear whether defendant was certain that Oleston was dead when she placed him in her car and disposed of him in a wildlife area. Mindful of this aspect of the offense, we cannot say that "[the] sentence *** greatly varie[d] from the spirit and purpose of the law or [was] manifestly disproportionate to the nature of the offense." *Id.*

¶ 26    Finally, we consider whether defendant's sentence was excessive when compared with the sentence of probation imposed on Mikalah for the same offense. Defendant argues that Mikalah was more culpable than her and had a criminal record, whereas defendant had a history of only noncriminal traffic offenses. Thus, defendant claims it was error to punish her more severely than Mikalah. We disagree.

¶ 27    We have observed:

"The arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. [Citation.] However, fundamental fairness is not violated simply because one defendant is sentenced to a greater term than another. [Citation.] While defendants similarly situated should not receive grossly disparate sentences, equal sentences are not required for all participants in the same crime. [Citation.] A sentencing disparity may be justified by differing degrees of involvement in the crime or any differences in the codefendants' criminal history, character, or rehabilitative potential. [Citation.] 'It is not the disparity that controls, but the reason for the disparity.' [Citation.] Sentencing is a matter of judicial discretion, and therefore, a sentence that is within statutory limits will not be overturned absent an abuse of discretion. [Citation.]" *People v. Stroup*, 397 Ill. App. 3d 271, 273-74 (2010).

¶ 28    We recognize that it was Mikalah who was reluctant to alert authorities about Oleston's situation. (Although defendant admitted in allocution that she also had been reluctant to call 911, the accounts given to the PSI writer indicated that defendant was the one who recommend calling 911.) However, as mother and daughter, defendant and Mikalah were not similarly situated. Even though both were adults, it was reasonable to expect defendant to exercise better judgment than her daughter. Defendant could have contacted the authorities notwithstanding Mikalah's protests, but instead she capitulated to Mikalah's wishes, and took the initiative in hiding Oleston's body. (We note that the record on appeal includes the PSI prepared for Mikalah's sentencing hearing and that Mikalah confirmed that it was defendant's idea to hide Oleston's body.)

¶ 29    In addition, the transcript of Mikalah's sentencing hearing (also included in the record on appeal) reveals that, when Mikalah was sentenced, she had recently given birth and was

breastfeeding her newborn. Section 5-5-3.1(a)(18)(A), (B) of the Unified Code of Corrections (730 ILCS 5/5-5-3.1(a)(18)(A), (B) (West 2022)) specifies the following mitigating factor:

> "The defendant is pregnant or is the parent of a child or infant whose well-being will be negatively affected by the parent's absence. Circumstances to be considered in assessing this factor in mitigation include:
>
> (A) that the parent is breastfeeding the child;
>
> (B) the age of the child, with strong consideration given to avoid disruption of the caregiving of an infant, pre-school or school-age child by a parent[.]"

In that regard, defendant and Mikalah were not similarly situated. Viewing all relevant circumstances, we cannot say that the disparity represents an abuse of the sentencing judge's considerable discretion.

¶ 30                                    III. CONCLUSION

¶ 31    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 32    Affirmed.